NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | Hon. Dennis M. Cavanaugh |
| BRIAN TYSON, | : | |
| | : | **OPINION** |
| Plaintiff, | : | |
| | : | Civil Action No. 07-CV-3105 (DMC) |
| v. | : | |
| | : | |
| PITNEY BOWES LONG-TERM | : | |
| DISABILITY PLAN et. al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion by Plaintiff Brian Tyson ("Tyson") to

remand to the plan administrator; and upon motions by Defendant Pitney Bowes ("Pitney") for

summary judgment and to strike materials from Tyson's briefing papers.  Pursuant to Fed. R. Civ.

P. 78, no oral argument was heard.  After considering the submissions of the parties, and based upon

the following, Tyson's motion to remand is **denied**, Pitney's motion for summary judgment is

**granted**, and Pitney's motion to strike is **denied**.

I.      BACKGROUND[1]

Plaintiff Brian Tyson is a former employee of Pitney and a participant in the Long-Term

Disability Plan (the "Plan") administered by Pitney Bowes, Inc. Employee Benefits Committee

_____

[1] The facts set-forth in this Opinion are taken from the parties' statements in their respective
moving papers.

(the "Committee").  In June 2003, Tyson was diagnosed with bilateral optic neuritis, which impairs his vision.  On June 4, 2003, Tyson began receiving short-term disability ("STD") benefits under Pitney Bowes Inc.'s Short-Term Disability Policy.  Tyson continued receiving STD benefits through November 2003, the maximum short-term benefit eligibility period under the Plan.  In December 2003, Tyson applied for, and received, long-term disability ("LTD") benefits.  Tyson received LTD benefits for the first twelve months of his eligibility.  In April 2005, Tyson's consulting physician, Dr. Larry Frohman, wrote to Pitney's consulting physician, Dr. Peter Griffin, concluding that "overall, [Tyson] is stable."  In a follow-up telephone conversation on May 19, 2005, Dr. Frohman stated that Tyson "can return to work provided that he does not drive."  On May 31, 2005, Dr. Khadija Shahid independently evaluated Tyson and concluded that he had "moderate visual impairments" and did not meet the New Jersey Division of Motor Vehicle driving standards, but that he could use public transportation without restrictions.

Following these medical examinations, Pitney Bowes' Disability Department requested that Paula Paiement ("Paiement"), a vocational expert ("VE") with MRN & Associates LLC, complete a labor market survey assessing Tyson's employability commensurate with his education, work experience, and transferrable skills.  Paiement's survey identified six positions in the New York / New Jersey area for which Tyson was qualified and could earn in excess of $77,000.  Upon receiving Paiement's survey, Pitney's Disability Department submitted the results along with medical information provided by Tyson's treating physician to two consulting physicians, Drs. Griffin and Pawlecki, for review.  After reviewing the materials, Drs. Griffin and

2

Pawlecki concluded that Tyson could return to the workforce in a capacity that did not require

driving, and recommended that his LTD benefits be terminated.

The Disability Department agreed with the determinations of Drs. Griffin and Pawlecki

and informed Tyson via letter on August 9, 2005 that his LTD benefits would be discontinued

effective August 20, 2005.  On February 20, 2006, Tyson appealed the Disability Department's

decision to the Committee.  Tyson supported his appeal with a vocational assessment conducted

by Charles Kincaid, PhD  ("Kincaid Analysis 1"), which concluded, *inter alia*, that Tyson is

unable to perform his past relevant work at a competitive rate; that Tyson has "significantly

reduced transferrable vocational skills to perform competitive jobs in his worker trait group in

the New Jersey labor market"; and that Tyson's wage earning power is "significantly

diminished."  The Committee asked Paiement to reassess her labor market survey in light of the

Kincaid Analysis 1.  On March 7, 2006, Paiement informed the Committee via letter that, having

considered the Kincaid Analysis 1, she had "not [found] any relevant information that would

change [her] conclusion."

On March 14, 2006, the Committee reviewed the medical information compiled by the

consulting physicians, Paiement's labor market survey, the Kincaid Analysis 1, and Tyson's

letter of appeal. The Committee concluded that the "medical evidence on the whole did not

suggest a disabling condition."  Following this meeting, Pitney sent a letter to Matthew Vance

("Vance"), Tyson's counsel, stating that before it could determine Tyson's capacity to earn at

least $77,898.60, it was "request[ing] some additional information from our vocational expert."

The letter informed Vance that, "although [Tyson's] file is complete and further information is

3

not required, please feel free to submit any additional information you wish the Committee to

consider [] no later than March 29, 2006." The letter also stated that the Committee would

determine Tyson's appeal no later than April 6, 2006. On April 3, 2006, the Committee met to

make its final determination. The Committee concluded that Tyson's appeal should be denied,

noting, *inter alia*, the findings of Paiement's labor market survey, the fact that Tyson's physician

had "reliably reported that [Tyson] could return to work in a capacity that did not require

driving," and that Tyson's "years of management and sales experience should prove very

advantageous in finding a position." On April 4, 2006, six days after the due date for submitting

additional information, Tyson's counsel received an additional vocational analysis from Kincaid

("Kincaid Analysis 2"), in which Kincaid reviewed and criticized Paiement's labor market

survey.

On April 5, 2006, the Committee formally denied Tyson's appeal. The Committee's

denial letter listed a series of reports and correspondence that the Committee had considered in

reviewing Tyson's claim, as well as relevant Plan provisions. The letter explained the rationale

for the Committee's decision, and instructed Tyson as to how he could bring a civil action. On

April 6, 2006, Pitney acknowledged that it had received the Kincaid Analysis 2, but indicated to

Tyson's counsel that, because the report was not received by the March 29, 2006 due date, the

Committee had not reviewed it prior to making its determination. Nonetheless, on April 27,

2006, Pitney sent Tyson's counsel a letter stating that the Committee would reconvene and

review the Kincaid Analysis 2, despite its late submission, provided that Tyson agreed to extend

the deadline for the Committee's decision to May 22, 2006, and to "waive the right to assert any

4

arguments relating to the process surrounding the extension in the event of litigation relating to his claim." The letter requested that Tyson acknowledge his assent by submitting a confirmation letter, and stated that he could submit additional materials for the Committee's consideration by May 10, 2006.

On May 4, 2006, Pitney obtained another independent vocational assessment from Howard Bullen (the "Bullen Analysis") of Professional Rehabilitative Services, Inc. The Bullen Analysis reviewed and compared the findings in Paiement's labor market survey and the Kincaid Analysis 1. The Analysis assessed Tyson's job placement potential and suggested that eight positions were commensurate with Tyson's medical and vocational capacities. It concluded that "based upon the demonstrated job postings and discussion with employer and staffing firm representatives in the Northern New Jersey area, it would appear that [Tyson] could expect to obtain a suitable inside sales position with a potential first year earnings of over $78,000."

On May 11, 2006, Pitney's Human Resources Legal Department sent an email to Tyson advising him that it had not heard from him regarding the April 27th proposal, and sought to confirm that he "did not send anything intended for receipt by the May 10th date." Despite receiving no response, the Committee reconvened on May 17–18 to reconsider "documents previously submitted," as well as Vance's April 5th letter, the Kincaid Analysis 2, and the Bullen Analysis.[2] Upon further consideration, however, the Committee unanimously decided to uphold

_____

[2] Tyson does not dispute that the Committee reviewed the Kincaid Analysis 2, nor does he dispute that the Committee took "note of the differences between the approaches taken in the initial vocational assessments, as well as the conclusion by Mr. Bullen that [Tyson's] earning capacity is indeed greater than $78,000."

its prior determination that Tyson is capable of earning at least $77,000.

On May 18, 2006, Tyson's counsel submitted to the Committee a "Statement of Appeal Process Deficiencies," detailing nine errors allegedly committed during the appeals process that "thwarted Mr. Tyson's right to a full and fair review of the claim denial." On May 19, 2006, the Committee sent Tyson's counsel a letter detailing its review procedures and informing him that it had considered the Bullen Analysis and that, nonetheless, it would not overturn its earlier decision terminating Tyson's disability benefits. On May 26, 2006, Tyson's counsel requested that the Committee disclose, *inter alia*, the vocational reports from Paiement and Bullen, copies of correspondence between Pitney and Bullen, Bullen's personal and professional credentials, and any memoranda, handwritten notes, and emails generated by the Committee during Tyson's appeal. On June 9, 2006, Pitney's outside counsel sent Tyson's counsel a copy of the administrative record containing "all documents deemed relevant to a claimant's claim under the Labor Regulations, [including] all documents, records, or other information relied upon, submitted, considered, or generated during the course of the benefit determination process."

## II.   DISCUSSION

Before the Court is Tyson's motion to remand to the plan administrator, and Pitney's motions for summary judgment and to strike materials from Tyson's briefing papers. For the foregoing reasons, Tyson's motion to remand is denied, Pitney's motion for summary judgment is granted, and Pitney's motion to strike is denied.

### A.   *Tyson's Motion to Remand*

Tyson first moves to remand this action to the plan administrator, arguing that he had a

right to comment on all of the evidence considered by the Committee, and that he was denied a

"full and fair review" when the Committee failed to provide him with an opportunity to comment

on the Bullen Analysis prior to its final determination.  ERISA requires that employee benefit

plans provide a "full and fair review" of adverse benefit determinations.  See 29 C.F.R. §

2560.503-1(h)(1).  Review procedures must take into account all comments, documents, records,

and other information submitted by the claimant relating to the claim, without regard to whether

such information was submitted or considered in the initial benefit determination.  See 29 C.F.R.

§ 2560.503-1(h)(2)(iv).  In the context of group health benefit plans, a "full and fair review" also

requires identification of "medical and vocational experts whose advice was obtained on behalf

of the plan in connection with a claimant's adverse benefit determination, without regard to

whether the advice was relied upon in making the benefit determination."  See 29 C.F.R. §

2560.503-1(h)(3)(iv).

     The ERISA regulations are silent, however, as to whether claimants are entitled to

comment on all documents relied upon by the plan administrator during its review.  Indeed, the

regulatory code states only that the reviewing administrator must provide reasonable access to all

such materials "upon request" by the claimant.  See 29 C.F.R. § 2560.503-1(h)(2)(iii).  The Third

Circuit has yet to determine whether this requires that claimants be given the opportunity to

comment on all documents relied upon by the plan administrator prior to its decision.[3]

---

[3] Tyson cites to Post v. Hartford Ins. Co., 501 F.3d 154 (3d Cir. 2007) for the proposition that a claimant must be given the opportunity to review a treating physician's medical report prior to a final benefits determination.  See id. at 166.  The discussion in Post, however, focused on the proper standard of review to be applied, rather than whether claimant's are entitled to

Nonetheless, the Court is persuaded by the approach taken by the Eighth, Tenth, and Eleventh

Circuits, which have concluded that claimants are not entitled to continually "rebut the opinions

of professionals consulted at [the administrative review] stage" because it would "set up an

unnecessary cycle of submission, review, re-submission, and re-review."  See, e.g., Midgett v.

Washington Group Int'l Long Term Disability Plan, 561 F.3d 887, 896 (8th Cir. 2009) (holding

that a plan participant was not entitled to review and rebut her physicians' peer reviews

concerning her alleged disability before the plan administrator denied her appeal of disability

benefits); Metzger v. UNUM Life Ins. Co. of Am., 476 F.3d 1161, 1166 (10th Cir. 2007)

(holding that a plan administrator is not required to provide claimant with access to medical

reports of appellate level reviewers prior to a final decision on appeal so long as the appellate

level reports analyze evidence already known to the claimant and contain no new factual

information or novel diagnoses); Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246

(11th Cir. 2008) (defendant not required to produce documents it relied upon while it reviewed

the initial denial of benefits; the production is appropriate after a final decision is made).

      Here, Tyson's motion to remand is denied because the Court finds that Tyson received a

"full and fair review."  First, Tyson had an opportunity to "submit written comments, documents,

records, and other information relating to the claim for benefits."  Not only did the Committee

consider the Kincaid Analysis 1 during its first review on March 14, 2006, but it also gave Tyson

the opportunity to submit additional relevant materials by March 29, 2006.  Furthermore, even

---

review all medical records upon which an adverse benefits determination is based.

8

though Tyson submitted the Kincaid Analysis 2 six days after the March 29 deadline, the

Committee nonetheless accepted and reviewed the report when it reconvened on May 17–18.

During the May 17–18 meeting, the Committee reconsidered both Paiement's labor market

survey and the two Kincaid analyses, and reviewed for the first time the Bullen Analysis.

Accordingly, the Court finds that Pitney afforded Tyson sufficient opportunity to submit his

evidence, and that it adequately addressed Tyson's submissions in denying his appeal.

Second, the Court finds that the Committee was not required to provide Tyson with an

opportunity to comment on the Bullen Analysis prior to its determination.  See, e.g., Midgett, 561

F.3d at 896.  A plan administrator is not obligated to provide a claimant with access to review-

level medical reports prior to a final decision provided that the reports only analyze evidence that

was already known to the claimant and contain no new factual information or novel diagnoses.

See Metzger, 476 F.3d at 1166.  Here, the Bullen Analysis was based upon information already

known to Tyson, was predicated on existing medical evidence, and contained no novel diagnoses

of Tyson's condition.  To require an opportunity to comment would simply have perpetuated a

"cycle of submission, review, re-submission, and re-review," thereby prolonging and increasing

the cost of the review process without raising any new substantive information.  See id. at

1166–67.  Additionally, the Committee was under no duty to produce the Bullen Analysis to

Tyson prior to his request for such materials on May 26.  See 29 C.F.R. § 2560.503-1(h)(2)(iii)

(noting that such documents need only be provided "upon request").  Accordingly, the Court

finds that Tyson's lack of an opportunity to comment on the Bullen Analysis prior to the

Committee's final determination did not deprive him of a "full and fair review."

B.      *Pitney's Summary Judgment Motion*

Pitney argues that summary judgment is appropriate because the Committee's decision to

terminate Tyson's LTD benefits was based upon substantial evidence.  Tyson responds that

summary judgment should be denied because: (1) the Committee operated under a conflict of

interest; (2) the Committee's decision was inconsistent with the language of the Plan; (3) the

Committee did not give proper weight to the fact that the Social Security Administration ("SSA")

had awarded Tyson disability benefits; (4) Pitney violated Tyson's procedural rights by failing to

provide him with a copy of the surveillance video after its decision; (5) the Committee

improperly limited its review to Tyson's ability to drive, and ignored medical evidence relating to

Tyson's other disabling conditions; and (6) the Committee improperly failed to consider his

status as former employee.  Because the Court finds that each of Tyson's arguments are without

merit, however, and because, in any event, the Court finds that the Committee's decision is

supported by substantial evidence, Pitney's motion for summary judgment is granted.

                      i.      Standard of Review

A denial of a benefits claim brought pursuant to ERISA is typically reviewed under a *de*

*novo* standard, "unless the plan grants discretionary authority to the administrator or fiduciary to

determine eligibility for benefits or interpret the terms of the plan."  See Estate of Schwing v.

The Lilly Health Plan, 562 F.3d 522, 525 (3d Cir. 2009).  Where the plan grants the administrator

discretionary authority, the court reviews the administrator's exercise of that authority under an

"arbitrary and capricious standard."  See Swiger v. Hartford, 2009 WL 1248080, *3 (W.D. Pa.

Apr. 30, 2009) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)).  Under

such circumstances, the administrator's decision "will be overturned only if it is clearly not

supported by the evidence in the record or the administrator has failed to comply with the

procedures required by the plan."  See Vitale v. Latrobe Area Hosp., 420 F.3d 278, 281–82 (3d

Cir. 2005).  This deferential standard applies to an administrator's interpretation of the plan's

language as well as to any factual determinations made by the administrator.  See Swiger, 2009

WL 1248080, at *3 (citing Mitchell v. Eastman Kodak Co., 113 F.3d 433, 438 (3d Cir. 1997)).

Furthermore, the arbitrary and capricious review standard applies regardless of whether

the administrator is found to have operated under a conflict of interest.  See Schwing, 562 F.3d at

525.  Conflicts are not determinative, and instead should be weighed as "one of several factors in

considering whether the administrator or fiduciary abused its discretion."  See id. (finding that

the "sliding scale" standard of review no longer applies to conflicts of interest).  Additional

factors for courts to consider include: the parties' sophistication; the information accessible to the

beneficiary; the financial arrangement between the employer and administrator; and the

administrator's claim evaluation process, including any procedural irregularities, bias, or

unfairness in that process.  See Swiger, 2009 WL 1248080, at *4.

Here, because the Plan grants to the Committee, as administrator, broad discretion both to

determine eligibility for benefits as well as to interpret the terms of the Plan, the Court will

review Tyson's appeal under an arbitrary and capricious standard of review.  Furthermore,

because the Plan pays out benefits from its Voluntary Employees' Beneficiary Association

("VEBA") trust fund, which is funded in part by Pitney and in part by employee contributions,

the Court finds that Pitney operates under a structural conflict of interest.  This is true even

11

though Pitney does not directly pay the LTD benefits, and instead voluntarily contributes funds to

a trust, because there nonetheless exists "a close relationship between benefits paid by the Trust

and the money Pitney must provide from its general assets to fund the Trust." See, e.g., Burke v.

Pitney Bowes Inc. Long-Term Disability Plan, 544 F.3d 1016, 1026 (9th Cir. 2008) ("Although

there is not a dollar-for-dollar correlation, it still remains true that the more that the Trust pays

out in benefits, the more Pitney must contribute to maintain the Trust's solvency.").  In any

event, this conflict is not determinative, and is just one of several factors the Court will consider

in determining whether the Committee acted in an arbitrary and capricious manner.  See

Schwing, 562 F.3d at 525.

     ii.  Summary Judgment Analysis

   The Court finds that summary judgment is appropriate in this case because the

Committee's decision to terminate Tyson's LTD benefits was neither arbitrary nor capricious.

As an initial matter, the Court notes that the Disability Department's decision to terminate

Tyson's LTD benefits was predicated upon extensive medical evaluations and expert vocational

assessments.  The Disability Department considered the evaluations of three consulting

physicians, Drs. Frohman, Griffin and Shahid, each of whom concluded that Tyson could return

to the labor force in some capacity that did not require him to drive.  In view of these medical

evaluations, the Disability Department commissioned an independent vocational assessment

(labor market survey), which identified employment opportunities available to Tyson

commensurate with his education, work experience, and transferrable skills.  The labor market

survey was then sent for further review to Drs. Pawlecki and Griffin, who concluded that Tyson

could return to the workforce in a capacity that did not require driving.  Accordingly, it appears

that the Disability Department's initial decision to deny benefits was based upon substantial

medical and vocational evidence.  Furthermore, the Court notes that the Disability Department's

decision-making process appears to have been without any of the "suspicious events" or

"procedural anomalies" that have existed in other cases.  See, e.g., Marciniak v. Prudential Fin.

Ins. Co., 184 Fed. App'x 266, 269 (3d Cir. 2006) (upholding benefits denial where based upon

medical findings and vocational expert reports, and stressing the absence of any "suspicious or

anomalous hijinks in [the employer's] decision-making process").

        Similarly, the Court finds that the Committee's decision to uphold the Disability

Department's benefits denial was based upon significant medical and vocational evidence, and

certainly was not arbitrary and capricious.  The Committee relied upon substantial medical

evidence, including the medical information compiled by the consulting physicians, Paiement's

labor market survey, both Kincaid analyses, and Bullen's vocational assessment.  In a similar

case, the Third Circuit held that an administrator's "reliance on two independent evaluations,

both of which came to the same conclusion that [the plaintiff] was able to perform gainful

employment, [and] where the [p]lan did not require a second evaluation, was clearly not

unreasonable."  See Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 47 (3d Cir. 1993).

Accordingly, the Court finds that the Committee's decision to deny Tyson's appeal was based

upon substantial evidence, and not arbitrary or capricious.

        Moreover, while the Court recognizes that a structural conflict of interest exists due to

Pitney's paying benefits out of the VEBA, the Court nonetheless finds that, when considered

13

along with the substantial evidence supporting the Committee's decision, as well as against what the Court deems to have been a fair claim evaluation process, any such conflict is insufficient to show that the Committee acted in an arbitrary or capricious manner.  See, e.g., Swiger, 2009 WL 1248080, at *4.

Nor is the Court persuaded by Tyson's arguments that the Committee's decision should be overturned because individual Committee members also operated under a conflict.  A conflict of interest exists in ERISA cases where a plan fiduciary has a "non-trivial financial incentive to act against the interests of the beneficiaries."  See Post v. Hartford Ins. Co., 501 F.3d 154, 162 (3d Cir. 2007).  Here, Tyson alleges that three individual Committee members were improperly influenced by a financial incentive to act against Tyson's interests.  The Court disagrees.  With respect to Committee member Johanna Torsone, for example, Tyson cites a magazine article in which Torsone discussed Pitney's attempts to reduce healthcare costs.  This statement, however, contains little support for a finding that Torsone abused her discretion as a Committee member.  Tyson also cites Concetta Caperella's in-depth knowledge of Pitney's investments in the VEBA trust as somehow creating an inherent conflict of interest.  Tyson provides no evidence, however, showing that Caperella's knowledge of the fund prejudiced her decision-making as a Committee member in any way.  Finally, Tyson describes David Nassef's responsibilities as the director of personnel, but offers no explanation as to how Nassef's position inherently prejudiced his decision.  Accordingly, while the Court recognizes that the Committee may have operated under varying degrees of potential conflict, the Court nonetheless finds no evidence suggesting that any of those conflicts actually prejudiced the Committee's decision, and that, when weighed against

14

the substantial evidence supporting the Committee's decision as well as the apparent fairness of

the claim review process, these alleged conflicts did not cause the Committee to act in an

arbitrary manner.

Tyson also argues that a conflict exists because the experts relied upon by the Committee

had an incentive to reduce Pitney's management and disability costs.  Again, the Court disagrees.

A plan fiduciary is a party that "exercised discretionary authority or control over a plan's

management, assets, or administration."  See Confer v. Custom Eng'g Co., 952 F.2d 34, 36 (3d

Cir. 1991).  If a person does not exercise authority or control over plan assets of management,

however, that person is not a fiduciary.  Id.  Here, the experts cited by Tyson were not plan

fiduciaries because none of them exercised any authority or control over the Plan's assets,

management, or administration.  Instead, the experts provided medical and vocational

assessments and recommendations to the Committee, which is the ultimate arbiter of Tyson's

appeal.  Accordingly, because the medical and vocational experts had no authority to compel any

particular determination by the Committee, the Court finds that the experts did not create any

conflict for the Committee.

Tyson next argues that the Committee's decision should be overturned because it was

based upon an erroneous interpretation of "total disability."  The Plan requires that the disability

determination be made "without regard to whether such occupation or employment exists in the

geographic area in which the employee resides."  Tyson argues that the Committee's reliance on

Paiement's labor market survey was improper because it identified employment opportunities in

"the geographic area."  The Committee admits that it "agreed with [Paiement] that it is

appropriate to look to average salaries and wages in the geographic area in which you live rather

15

than to lower, national averages."  Nonetheless, Paiement's labor market survey was but one of

many sources of information upon which the Committee relied in making its determination,

including: (1) the medical testimony of its consulting physicians, who determined that Tyson

could return to work provided that he does not drive; (2) both of the Kincaid analyses, which

assessed Tyson's employability both locally and nationally; and (3) the Bullen Analysis, which

concluded that "suitable positions are available at the targeted wage rate and consistent with both

Dr. Kincaid's and Ms. Paiement's estimations that Mr. Tyson may return to suitable work in the

sales representative occupational field."  Accordingly, even though the Paiement survey may

have been considered by the Committee, the Court nonetheless finds that the Paiement survey

was but one decisional factor among many, and that, particularly in light of the substantial

evidence supporting the Committee's decision, it does not support a finding that the Committee's

decision was arbitrary and capricious.

Nor did the Committee abuse its discretion by allegedly failing to consider Tyson's

$1,536 monthly social security disability insurance award.  While the decision of the SSA may be

considered as a factor in evaluating whether a plan administrator acted arbitrarily in reviewing a

plaintiff's claim, courts are not required to give such determinations controlling weight.  See

Marciniak, 184 Fed. App'x at 269.  Here, the minutes from the Committee's March 14, 2006

meeting demonstrate that the Committee was fully aware of Tyson's social security award, but

that it denied benefits anyway.  Because the Court finds that the Committee's decision is

reasonably grounded in substantial evidence, however, and because, in any event, the Court is not

required to give controlling weight to the SSA's determination of disability, the Court finds that

the Committee did not act arbitrarily in denying Tyson's benefits claim over the SSA's findings.

Tyson's argument that the Committee abused its discretion because it did not provide him with a copy of the surveillance video following its decision also fails.  ERISA requires that plan administrators provide claimants reasonable access to relevant documents that were "submitted, considered, or generated in the course of making the benefit determination."  See 29 C.F.R. § 2560.50-1(m)(8)(ii).  Here, Tyson admits that the Committee reviewed the surveillance reports and still photographs, but that it did not review the actual surveillance tapes.  Tyson also concedes that the Committee provided him with those materials.  As such, the Court finds that Pitney complied with ERISA's production requirements by providing Tyson with all relevant information that it relied upon during the course of its investigation, and that the Committee's refusal to provide the actual surveillance tapes is not a "defect" precluding summary judgment.  See, e.g., Russell v. Paul Revere Life Ins. Co., 148 F. Supp. 2d 392, 411 (D. Del. 2001) (merely providing an overview of videotapes rather than permitting claimant to view the actual tapes was not a "defect" sufficient to preclude summary judgment).

Tyson next argues that the Committee improperly "focused its disability analysis on [his] ability to drive," and that it failed to consider the effect that his vision impairment has on other daily activities, including his ability to shave, repair his automobile, shop for groceries, and read a computer screen.  Under Section 2.33(a)(i) of the Plan, a participant is "totally disabled" when he is unable to "perform the material duties of his own occupation for a maximum period of twelve (12) months," and where "thereafter the Participant is unable, because of injury or illness, to engage in any gainful employment suited by education, experience, or training."  This provision required the Committee to consider Tyson's ability to return to work or to secure alternate employment commensurate with his education, work experience, and transferrable

17

skills.  It did not necessarily require, however, that the Committee consider and make findings on

Tyson's ability to perform other routine daily activities, including his ability to shave, repair cars,

and grocery shop.  Accordingly, the Court finds that the Committee complied with the Plan by

basing its benefits decision upon the medical and vocational data relating to Tyson's

employability and earning ability, and that it did not act arbitrarily, at least under the

circumstances, by allegedly failing to consider his ability to perform these other daily activities.

Finally, Tyson's status as a former employee does not support a finding that the

Committee acted arbitrarily.  Tyson contends that his status as a former employee of Pitney

enhanced the possibility that the Committee would act in its own monetary self-interest because

the Committee no longer had to worry about issues such as employee morale or wage demands.

See Smathers v. Multi-Tool, Inc. / Multi-Plastics, Inc. Employee Health & Welfare Plan, 298

F.3d 191, 198 (3d Cir. 2002).  While a claimant's status as a current or former employee is a

factor that courts may consider in deciding whether the decision-maker abused its discretion, see

Kosiba v. Merck & Co., 384 F.3d 58, 64 (3d Cir. 2004), the Court finds no support for such a

finding here.  Accordingly, because it sees no evidence showing that Tyson's status as a former

employee raised a prejudicial conflict of interest, Tyson's argument on this ground is rejected.

      C.     *Pitney's Motion to Strike*

Finally, Pitney moves to strike Tyson's Brief in Opposition to Defendants' Motion for

Summary Judgment ("Opposition") and parts of Tyson's Response to Defendants' Statement of

Undisputed Facts ("Response"), arguing that Tyson failed to comply with Local Rules 7.1 and

56.1.  Federal Rule of Civil Procedure 12(f) permits a party to strike "from a pleading an

insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Courts

possess considerable discretion under Rule 12(f) to dispose of motions to strike.  See Kim v. Baik, 2007 WL 674715, *5 (D.N.J. Feb. 27, 2007).  Motions to strike are disfavored, however, and "usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case."  Id.  Striking matters from the record is a "drastic remedy to be resorted to only when required for the purposes of justice."  Id.  Here, the Court finds that none of Tyson's alleged infractions of the Local Rules merit the "drastic remedy" of striking materials from the record.  Accordingly, Pitney's motion to strike is denied.

**III.      CONCLUSION**

          For the foregoing reasons, Tyson's motion to remand is **denied**, Pitney's motion for summary judgment is **granted**, and Pitney's motion to strike is **denied**.  An appropriate Order accompanies this Opinion. __

                                                        S/ Dennis M. Cavanaugh

                                                        Dennis M. Cavanaugh, U.S.D.J.

Date:              August  11 ,  2009
Orig.:             Clerk
cc:                All Counsel of Record
                   Hon. Mark Falk, U.S.M.J.
                   File